**Nos. 25-1980, 25-5064**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

SAN DIEGO GAS & ELECTRIC COMPANY, *et al.*
*Petitioners*,
v.
FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

On Petition for Review of Final Orders of the Federal Energy Regulatory Commission

# BRIEF OF PETITIONERS SAN DIEGO GAS & ELECTRIC COMPANY, PACIFIC GAS AND ELECTRIC COMPANY, AND SOUTHERN CALIFORNIA EDISON COMPANY


Ross Fulton
Dan King
SAN DIEGO GAS & ELECTRIC COMPANY
8330 Century Park Court
San Diego, CA 92123
Telephone: (858) 654-1861
rfulton@sdge.com

John Perkins
Tara Kaushik
PACIFIC GAS AND ELECTRIC COMPANY
300 Lakeside Drive
Oakland, CA 94612
Telephone: (650) 766-9147
jr4t@pge.com

Andrea Tozer
Alexa Mullarky
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Avenue
Rosemead, CA 91770
Telephone: (626) 302-6713
Andrea.tozer@sce.com

Zachary C. Schauf
Anand Viswanathan
Arjun R. Ramamurti
JENNER & BLOCK LLP
1099 New York Ave., NW Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
zschauf@jenner.com

Laurie Edelstein
JENNER & BLOCK LLP
525 Market Street, 29th Floor
San Francisco, CA 94105
Telephone: (628) 267-6800
ledelstein@jenner.com

*Counsel for Petitioners San Diego Gas & Electric Company, Pacific Gas and Electric Company, and Southern California Edison Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners submit the following disclosure statement:

San Diego Gas & Electric Company is a subsidiary of Sempra, a publicly held corporation. No publicly held corporation has a 10 percent or greater ownership interest in Sempra.

Pacific Gas and Electric Company is a subsidiary of PG&E Corporation, a publicly held corporation. No publicly held corporation has a 10 percent or greater ownership interest in PG&E Corporation.

Southern California Edison Company is a subsidiary of Edison International, a publicly held corporation. No publicly held corporation has a 10 percent or greater ownership interest in Edison International.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ..........................................................................iv

GLOSSARY ..................................................................................................x

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT ...............................................................7

STATUTORY AND REGULATORY AUTHORITIES ......................................8

ISSUES PRESENTED....................................................................................8

STATEMENT OF THE CASE.........................................................................9

I. LEGAL AND FACTUAL BACKGROUND..............................................9

A. FERC Has Exclusive Authority Over Transmission Rates..................9

B. Congress Required FERC To Provide The Adder For Membership In Regional Transmission Organizations.......................12

C. Petitioners Joined A Regional Transmission Organization. ...............14

D. California Targeted Petitioners' Adder, And This Court Remanded The Issue In *CPUC I*. .....................................................15

E. California And SDG&E Settled The TO5 Rate Case And Crafted The Refund Provision To Allow The Resolution Of The Adder Issue In The CPUC Adder Litigation. .............................17

F. The Issue Reserved In The Refund Provision Was Resolved When This Court In *CPUC II* Held That Petitioners Remained Entitled To The Adder.................................................................20

G. California Enacted New Legislation To Target Petitioners' Federal Rate.........................................................................................21

II. PROCEDURAL HISTORY .....................................................................24

A. In The TO5 Case, FERC Interpreted The Refund Provision To Require SDG&E To Provide Refunds Of Lawfully Collected Funds. ....24

B. In The TO6 Rate Case, FERC Held That California's Mandate Eliminates SDG&E's Entitlement To The Adder. ....25

SUMMARY OF ARGUMENT ....27

STANDARD OF REVIEW ....29

ARGUMENT ....30

I. FERC'S INTERPRETATION OF THE REFUND PROVISION IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. ....30

A. The Settlement's Text And Structure Limit The Refund Provision To The Then-Pending CPUC Adder Litigation. ....32

B. Context Confirms That SDG&E's Interpretation Is Correct. ....39

C. Extrinsic Evidence Further Underscores That SDG&E Is Correct. ....43

D. FERC's Unmoored Reading Produces Unreasonable And Inequitable Results. ....47

E. FERC's Reading Gives Retroactive Effect To Later-Enacted Law, Contrary To The Presumptions Of Both California And Federal Law. ....50

F. FERC's Remaining Arguments Do Not Withstand Scrutiny. ....53

II. FERC UNLAWFULLY DENIED SDG&E THE ADDER IN THE TO6 PROCEEDING. ....54

CONCLUSION ....60

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Tohono O'odham Nation*, 818 F.3d 549 (9th Cir. 2016) .......................44

*Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir. 2002) ..................................................................................... 47-48

*Burlington Northern & Santa Fe Railway Co. v. Surface Transportation Board*, 403 F.3d 771 (D.C. Cir. 2005) .....................................55

*California Public Utilities Commission v. FERC*, 879 F.3d 966 (9th Cir. 2018) ..........................................................................14, 15, 16, 29

*California Public Utilities Commission v. FERC*, 29 F.4th 454 (9th Cir. 2022) ............................................................................2, 15, 21, 49

*Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052 (2026) ....................4, 34

*Consolidated Edison Co. of New York, Inc. v. FERC*, 347 F.3d 964 (D.C. Cir. 2003) .........................................................................11

*County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999).......................55

*County of San Bernardino v. Insurance Co. of Pennsylvania*, 174 F.4th 597 (9th Cir. 2026).......................................................................45

*Dayton Power & Light Co. v. FERC*, 126 F.4th 1107 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 397 (2025)..................................................59

*FERC v. Electric Power Supply Ass'n*, 577 U.S. 260 (2016)..............................9, 12

*FirstEnergy Service Co. v. FERC*, 758 F.3d 346 (D.C. Cir. 2014) ..................... 9-10

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) ............................................11

*Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958)..............................59

*Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150 (2016) .............................12

*International Brotherhood of Teamsters v. NASA Services, Inc.*, 957 F.3d 1038 (9th Cir. 2020) ...............................................................38

*Kia Motors America, Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733 (6th Cir. 2013) ....................51

*Louisiana Public Service Commission v. FERC*, 860 F.3d 691 (D.C. Cir. 2017) ....................57, 58

*Maryland Office of People's Counsel v. FERC*, 164 F.4th 920 (D.C. Cir. 2026) ....................10, 11

*MISO Transmission Owners v. FERC*, 177 F.4th 1204 (D.C. Cir. 2026) ....................10

*Montana Wildlife Federation v. Haaland*, 127 F.4th 1 (9th Cir. 2025) ....................29

*Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)....................29

*National Shooting Sports Foundation, Inc. v. California*, 5 Cal. 5th 428 (2018)....................48

*Nish Noroian Farms v. Agricultural Labor Relations Board*, 35 Cal. 3d 726 (1984)....................40

*Olson v. Doe*, 12 Cal. 5th 669 (2022) ....................40

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015)....................54

*Pacific Gas & Electric Co. v. FERC*, No. 24-2527, 2025 WL 1912363 (9th Cir. July 11, 2025), *cert. denied*, No. 25-438, 2026 WL 490575 (U.S. Feb. 23, 2026)....................2, 22, 54

*Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33 (1968) ....................30, 45

*Pennzoil Co. v. FERC*, 645 F.2d 360 (5th Cir. 1981)....................31

*Port of Seattle v. FERC*, 499 F.3d 1016 (9th Cir. 2007) ....................38, 55

*PSEG Energy Resources & Trade LLC v. FERC*, 665 F.3d 203 (D.C. Cir. 2011) ....................42

*Public Utilities Commission of California v. FERC*, 254 F.3d 250 (D.C. Cir. 2001) ....................10

*Southern California Edison Co. v. FERC*, 502 F.3d 176 (D.C. Cir. 2007) ....................31

*Southern California Edison Co. v. FERC*, 717 F.3d 177 (D.C. Cir. 2013) ....................59, 60

*Sacramento Municipal Utility District v. FERC*, 428 F.3d 294 (D.C. Cir. 2005) ....................59

*Swenson v. File*, 3 Cal. 3d 389 (1970) ....................51, 52

*Transmission Agency of Northern California v. Sierra Pacific Power Co.*, 295 F.3d 918 (9th Cir. 2002) ....................9

*Trident Center v. Connecticut General Insurance. Co.*, 847 F.2d 564 (9th Cir. 1988) ....................45

*Turlock Irrigation District v. FERC*, 903 F.3d 862 (9th Cir. 2018) ....................29

*West Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014) ....................55

*West Pueblo Partners, LLC v. Stone Brewing Co., LLC*, 90 Cal. App. 5th 1179 (1st Dist. 2023) ....................48

*Winet v. Price*, 4 Cal. App. 4th 1159 (4th Dist. 1992) ....................46

*Wolf v. Superior Court*, 114 Cal. App. 4th 1343 (2d Dist. 2004) .................... 44-45, 46

*Zissler v. Saville*, 29 Cal. App. 5th 630 (2d Dist. 2018) ....................45

**STATUTES**

16 U.S.C. § 824(b)(1) ....................9, 54

16 U.S.C. § 824a(a) ....................54

16 U.S.C. § 824d ....................7, 10

16 U.S.C. § 824d(a) ....................9, 55, 56, 57

16 U.S.C. § 824d(d) ....................55

16 U.S.C. § 824e ....................7, 11

16 U.S.C. § 824e(a) ....................11, 56, 57

16 U.S.C. § 824e(b) .......... 11, 36

16 U.S.C. § 824s .......... 13

16 U.S.C. § 824s(c) .......... 13, 54

16 U.S.C. § 824s(d) .......... 56

16 U.S.C. § 825*l*(b) .......... 8

Cal. Civ. Code § 1636 .......... 50

Cal. Civ. Code § 1638 .......... 48

Cal. Civ. Code § 1643 .......... 48

Cal. Civ. Code § 1647 .......... 30, 40

Cal. Pub. Util. Code § 362(c) .......... 21

**Legislative Materials**

A2757, 222d Leg., 2026-2027 Reg. Sess. § 2 (N.J. 2026) .......... 7

Conn. Pub. Act No. 25-173 § 28(b) (Conn. 2025) .......... 7

H7127, art. XI (R.I. 2026) .......... 7

H.B. 1532, 2026 Reg. Sess., ch. 353, § 4 (Md. 2026) (enacted Apr. 14, 2026) (to be codified at Md. Code Ann., Pub. Util. § 7-109), https://legiscan.com/MD/text/HB1532/id/3438000 .......... 7

H.R. 782, Gen. Assemb., 2023-2024 Reg. Sess. (Pa. 2025) .......... 7

**Administrative Rulings**

*Dayton Power & Light*, 176 FERC ¶ 61,025 (2021), *modified on denial of reh'g*, 178 FERC ¶ 61,102 (2022), *aff'd sub nom. Dayton Power & Light Co. v. FERC*, 126 F.4th 1107 (6th Cir. 2025) .......... 59

*Joint Application of Pacific Gas & Electric Co.*, D.98-01-053, 1998 WL 242747 (Cal. P.U.C. Jan. 21, 1998) .......... 15

*Order Instituting Rulemaking on Commission's Proposed Policies Governing Restructuring California's Electric Service Industry and Reforming Regulation*, D.95-12-063, 1995 WL 792086 (Cal. P.U.C. Dec. 20, 1995) ........ 14

*Pacific Gas & Electric Co.*, 148 FERC ¶ 61,245 (2014), *review granted, cause remanded sub nom. California Public Utilities Commission v. FERC*, 879 F.3d 966 (9th Cir. 2018) ........ 15

*Pacific Gas & Electric Co.*, 152 FERC ¶ 61,252 (2015), *review granted, cause remanded sub nom. California Public Utilities Commission v. FERC*, 879 F.3d 966 (9th Cir. 2018) ........ 15

*Pacific Gas & Electric Co.*, 165 FERC ¶ 61,244 (2018) ........ 19

*Pacific Gas & Electric Co.*, 168 FERC ¶ 61,038 (2019), *aff'd sub nom. California Public Utilities Commission v. FERC*, 29 F.4th 454 (9th Cir. 2022) ........ 2, 16, 33

*Pacific Gas & Electric Co.*, 168 FERC ¶ 61,217 (2019), *aff'd sub nom. California Public Utilities Commission v. FERC*, 29 F.4th 454 (9th Cir. 2022) ........ 17, 20

*Pacific Gas & Electric Co.*, 170 FERC ¶ 61,194 (2020), *aff'd sub nom. California Public Utilities Commission v. FERC*, 29 F.4th 454 (9th Cir. 2022) ........ 2

*Pacific Gas & Electric Co.*, 185 FERC ¶ 61,243 (2023), *modified on denial of reh'g*, 187 FERC ¶ 61,167 (2024), *aff'd sub nom. Pacific Gas & Electric Co. v. FERC*, No. 24-2527, 2025 WL 1912363 (9th Cir. July 11, 2025), *cert. denied*, No. 25-438, 2026 WL 490575 (U.S. Feb. 23, 2026) ........ 22

*Pacific Gas & Electric Co.*, 187 FERC ¶ 61,167 (2024) ........ 22

*PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,053 (2021) ........ 5, 30, 39

*Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 (2006), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007) ........ 13, 14

*Promoting Transmission Investment through Pricing Reform*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007) ........ 14

*Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285, 1999 WL 33505505 (1999), *on reh'g*, 90 FERC ¶ 61,201 (2000) ........ 12

*San Diego Gas & Electric Co.*, 118 FERC ¶ 61,073 (2007) ........ 15

*San Diego Gas & Electric Co.*, 143 FERC ¶ 61,246 (2013) ........ 15

*San Diego Gas & Electric Co.*, 165 FERC ¶ 61,276 (2018) ........ 17, 35

*San Diego Gas & Electric Co.*, 170 FERC ¶ 61,240 (2020) ........ 20

*Southern California Edison Co.*, 121 FERC ¶ 61,168 (2007) ........ 15

*Southern California Edison Co.*, 168 FERC ¶ 61,206 (2019), *aff'd sub nom. California Public Utilities Commission v. FERC*, 29 F.4th 454 (9th Cir. 2022) ........ 17

*Viridon California LLC*, 186 FERC ¶ 61,143 (2024) ........ 56

**OTHER AUTHORITIES**

18 C.F.R. § 35.13 ........ 10

18 C.F.R. § 35.34(f) ........ 12

18 C.F.R. § 35.34(k)(7) ........ 12

FERC, *Formula Rates in Electric Transmission Proceedings* http://www.ferc.gov/formula-rates-electric-transmission-proceedings-key-concepts-and-how-participate (last updated July 5, 2022) ........ 11

*Restatement (Second) of Contracts* (1981) ........ 30, 38, 39

Antonin Scalia, *A Matter of Interpretation* (1997) ........ 4

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2011) ........ 4

## GLOSSARY

| | |
|---|---|
| **1998 Transfer Decision** | *Joint Application of Pacific Gas & Elec. Co.*, D.98-01-053, 1998 WL 242747 (Cal. P.U.C. Jan. 21, 1998) |
| **CAISO** | California Independent System Operator Corporation |
| **CPUC** | California Public Utilities Commission |
| ***CPUC I*** | *CPUC v. FERC*, 879 F.3d 966 (9th Cir. 2018) |
| ***CPUC II*** | *CPUC v. FERC*, 29 F.4th 454 (9th Cir. 2022) |
| **DWR** | California Department of Water Resources State Water Project |
| **FERC** | Federal Energy Regulatory Commission |
| **FPA** | Federal Power Act |
| **Hearing Order** | *SDG&E*, 165 FERC ¶ 61,276 (2018) (3-ER-443) |
| **ISO** | Independent System Operator |
| **Petitioners** | San Diego Gas & Electric Company; Pacific Gas and Electric Company; and Southern California Edison Company |
| **PG&E** | Pacific Gas and Electric Company |
| **PG&E Adder Order** | *PG&E*, 185 FERC ¶ 61,243 (2023) (2-ER-283) |
| **PG&E Adder Rehearing Order** | *PG&E*, 187 FERC ¶ 61,167 (2024) (2-ER-219) |
| **PG&E Remand Order** | *PG&E*, 168 FERC ¶ 61,038 (2019) (3-ER-414) |
| **PG&E Remand Rehearing Order** | *PG&E*, 170 FERC ¶ 61,194 (2020) (2-ER-309) |
| **PG&E TO19 Rehearing Order** | *PG&E*, 168 FERC ¶ 61,217 (2019) (2-ER-369) |

| | |
|---|---|
| **Refund Order** | *CPUC v. SDG&E*, 189 FERC ¶ 61,173 (2024) (1-ER-89) |
| **Refund Provision** | TO5 Settlement Agreement § 1.5.1 |
| **Refund Rehearing Order** | *CPUC v. SDG&E*, 192 FERC ¶ 61,010 (July 2, 2025) (1-ER-30) |
| **ROE** | Return on Equity |
| **RTO** | Regional Transmission Organization |
| **SCE** | Southern California Edison Company |
| **SCE TO18 Rehearing Order** | *SCE*, 168 FERC ¶ 61,206 (2019) (2-ER-352) |
| **SDG&E** | San Diego Gas & Electric Company |
| **Section 219** | 16 U.S.C. § 824s(c) |
| **TO5** | San Diego Gas & Electric Company's Fifth Transmission Owner Rate Case |
| **TO6 Order** | *SDG&E*, 189 FERC ¶ 61,248 (2024) (1-ER-71) |
| **TO6 Rehearing Order** | *SDG&E*, 192 FEC ¶ 61,015 (2025) (1-ER-2) |
| **TO17 Settlement Offer** | PG&E, Offer of Settlement and Stipulation § 2.3(c), Docket No. ER15-2294-000 (3-ER-475) |
| **TO19 Settlement Offer** | PG&E Offer of Settlement and Stipulation (Sept. 21, 2018) (3-ER-463) |

## INTRODUCTION

Settlements are contracts, but the Federal Energy Regulatory Commission ("FERC") rewrote a settlement into a deal nobody would sign. In October 2019, San Diego Gas & Electric Company ("SDG&E") and California[1] settled SDG&E's fifth Transmission Owner rate case ("TO5"), which set how SDG&E would recover its costs for transmission services. In parallel, SDG&E and California were litigating one rate-related issue elsewhere: Whether three California investor-owned utilities were entitled to a federal rate incentive (the "Adder") provided to transmission owners that join a regional transmission organization ("RTO"). That dispute involved SDG&E, Pacific Gas and Electric Company ("PG&E"), and Southern California Edison Company ("SCE"; together, "Petitioners"). Petitioners had long received the Adder before California challenged their eligibility.

SDG&E and California wanted to settle TO5 while preserving their opposing positions in the parallel litigation (the "CPUC Adder Litigation"). So they crafted a mechanism to incorporate the results of the CPUC Adder Litigation. Thus, the TO5 settlement provided that SDG&E would refund the Adder as of June 1, 2019, if FERC "issue[d] an order ruling that California investor-owned utilities are no longer

[1] This brief uses "California" to refer collectively to the various California entities involved in litigating the issues in this appeal, including the California Public Utilities Commission ("CPUC"), the California Department of Water Resources State Water Project ("DWR"); the Cities of Anaheim, Azusa, Banning, Colton, Pasadena, and Riverside, California; and the Northern California Power Agency.

eligible for the … [A]dder." 2-ER-345 (TO5 Settlement Agreement § 1.5.1) ("Refund Provision"). But ultimately, FERC issued an order in the CPUC Adder Litigation ruling that Petitioners remained eligible for the Adder, and this Court affirmed. Those decisions rejected California's argument that state law mandated Petitioners' RTO membership and that Petitioners therefore were not eligible for the Adder under FERC orders limiting the Adder to "voluntary" participants. *PG&E*, 168 FERC ¶ 61,038 (2019) ("PG&E Remand Order") (3-ER-414); *PG&E*, 170 FERC ¶ 61,194 (2020) ("PG&E Remand Rehearing Order") (2-ER-309); *Cal. Pub. Utils. Comm'n v. FERC*, 29 F.4th 454, 468 (9th Cir. 2022) (*"CPUC II*"). That should have been the end for the Refund Provision.

Years later, however, FERC turned the Refund Provision into a blank check to award California retroactive refunds based on later-enacted legislation. In 2022, six months after *CPUC II*, California enacted a law expressly targeted only at SDG&E, PG&E, and SCE that FERC read to mandate RTO membership for only these three companies—not California's other transmission owners—and to eliminate PG&E's Adder. *PG&E v. FERC*, No. 24-2527, 2025 WL 1912363 (9th Cir. July 11, 2025), *cert. denied*, No. 25-438, 2026 WL 490575 (U.S. Feb. 23, 2026). Below, California asked FERC to declare that its orders eliminating PG&E's Adder under this new law triggered the Refund Provision and required refunds back to June 1, 2019. Had California fully litigated SDG&E's entitlement to the Adder and not

settled TO5, it could never have received refunds back to that date. Instead, the filed-rate doctrine would have allowed refunds no earlier than when California filed a complaint based on the new law. Concretely put, absent the settlement, California could have stripped SDG&E's adder going back no further than the new law's September 2022 effective date (and in fact, FERC did not strip PG&E's adder until December 2023). Yet in the orders on review, FERC nonetheless interpreted the Refund Provision to confer *greater* rights than California ever could have obtained in litigation over the Adder and to compel refunds back to June 1, 2019—even though Petitioners vindicated their right to the Adder in *CPUC II*.

FERC's interpretation has no limits. On that interpretation, SDG&E must pay refunds back to 2019 based on California's 2022 legislation, even though Petitioners won the CPUC Adder Litigation pending when SDG&E and California settled. And SDG&E would remain on the hook for refunds back to 2019 if California enacted the new legislation 30 years later in 2052; if SDG&E instead lost the Adder because Congress repealed the Adder statute; or if SDG&E decided to withdraw from California's RTO, the California Independent System Operator ("CAISO"), and any other RTO (rendering it no longer eligible for the Adder). Applying that boundless interpretation, California claims SDG&E must return more than $110 million, much of it for periods when SDG&E indisputably was entitled to the Adder under then-existing law.

This interpretation is not a reasonable reading of the parties' bargain, and it is contrary to law and arbitrary and capricious. When the Refund Provision referred to FERC "issu[ing] an order" concerning "California investor-owned utilitie*s*" (plural), the parties meant the then-ongoing CPUC Adder Litigation where FERC was already considering Petitioners' arguments about their Adder eligibility under California law at the time. And the settlement embedded that context in the text: It specified that the parties sought to "resolve[] all issues set for hearing and settlement judge procedures." 2-ER-348 (TO5 Settlement Agreement § 4.1). One of those issues was whether SDG&E would remain eligible for the Adder based on the outcome of the CPUC Adder Litigation. The California Public Utilities Commission ("CPUC") had expressly "recommended" that FERC resolve SDG&E's eligibility by incorporating the outcome of those proceedings. That is what the parties did.

FERC reads the Refund Provision more broadly. The phrase "an order," in FERC's view, reaches *any* order FERC might issue finding California investor-owned utilities no longer Adder-eligible, on any basis and at any time. But even where text is king, that wooden approach is misguided: "Context is a primary determinant of meaning," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2011), and "the good textualist is not a literalist, neither is he a nihilist," Antonin Scalia, *A Matter of Interpretation* 24 (1997); *accord Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1061 (2026) (endorsing

this proposition). FERC long recognized that principle, before forgetting it below. *E.g.*, *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,053 at PP14-15 (2021).

Here, the text in context permits only one conclusion: The parties agreed to tie the Refund Provision to the then-pending CPUC Adder Litigation, not to create a "springing" refund obligation if California investor-owned utilities ever lost their Adder entitlement based on new legislation or to give California more than it could have received had the parties litigated TO5. Had the parties intended that extraordinary and retroactive result, one would expect a clear statement and some extraordinary concession to SDG&E in return. Neither exists. Worse, FERC trumpeted that it "d[id] not need to" "explain why it makes sense to interpret the … Refund Provision to yield" this irrational result, *CPUC v. SDG&E*, 192 FERC ¶ 61,010 at P23 n.60 (July 2, 2025) ("Refund Rehearing Order") (1-ER-41). That confesses error in a contract case where the task is ascertaining the parties' reasonable intent.

FERC's reading is especially untenable given one more piece of context: When PG&E settled its TO19 rate case one year before SDG&E did—in a proceeding FERC itself characterizes as "contemporaneous," and in which SDG&E and California were also parties—the parties included a similar refund provision that cross-referenced by docket number the then-pending parallel proceeding. *See* 1-ER-43 (*id.* at P25). FERC's interpretation requires believing that the parties here silently

intended to impose on SDG&E a vastly broader refund obligation. That again is not a reasonable reading of the parties' intent.

This appeal also presents a second issue—the underlying question of whether SDG&E should have received the Adder in its successor rate case (the "TO6" proceeding). FERC's denial of the Adder in TO6 is unlawful for many reasons, including because it violates the prohibition on "undue discrimination" in the Federal Power Act ("FPA"). FERC deprived *only the three* Petitioners of their Adders after California enacted legislation targeting these disfavored utilities to achieve that precise result. Every other transmission owner that participates in CAISO can still receive the Adder.

In justifying that disparate treatment, the sum total of FERC's reasoning is that it could discriminate against Petitioners because California did. But Congress imposed *on FERC* the duty to ensure that federal rates are just and reasonable and not unduly discriminatory. FERC cannot simply outsource to states its duty to avoid undue discrimination in the administration of a federal rate incentive governing participation in federally regulated RTOs. That is particularly true because FERC's approach transparently invites states to arbitrarily pick winners and losers. Favored companies keep their Adder; others receive a state RTO mandate that is a pretext for reducing their rates. Nor is that danger hypothetical: Other California transmission owners *right now* receive the Adder; Connecticut, Maryland, Rhode Island, and New

Jersey recently enacted RTO mandates that aim expressly to adjust the federal rate by removing Adders; and other states are considering similar legislation.[2]

## JURISDICTIONAL STATEMENT

FERC had jurisdiction over the proceedings below pursuant to sections 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d, 824e.

In Docket No. EL24-115, FERC on December 5, 2024 issued its initial order granting California's petition for declaratory order that the Refund Provision requires SDG&E to pay refunds of the Adder for RTO participation. *CPUC v. SDG&E*, 189 FERC ¶ 61,173 (2024) ("Refund Order") (1-ER-89). Petitioners timely sought rehearing on January 6, 2025. 2-ER-156. FERC issued a Notice of Denial of Rehearing By Operation of Law and Providing for Further Consideration on February 6, 2025, 190 FERC ¶ 62,074 (2025) (1-ER-70), and a substantive order on rehearing on July 2, 2025, 1-ER-30 (Refund Rehearing Order).

In Docket No. ER25-270, FERC issued its initial order denying the Adder in SDG&E's TO6 formula rate case on December 31, 2024. *SDG&E*, 189 FERC ¶ 61,248 (2024) ("TO6 Order") (1-ER-71). Petitioners timely sought rehearing on

[2] Conn. Pub. Act No. 25-173 § 28(b) (Conn. 2025); H7127, art. XI (R.I. 2026); H.B. 1532, 2026 Reg. Sess., ch. 353, § 4, at 40 (Md. 2026) (enacted Apr. 14, 2026) (to be codified at Md. Code Ann., Pub. Util. § 7-109), https://legiscan.com/MD/text/HB1532/id/3438000; A2757, 222d Leg., 2026-2027 Reg. Sess. § 2 (N.J. 2026); *see also* H.R. 782, Gen. Assemb., 2023-2024 Reg. Sess. (Pa. 2025).

January 30, 2025. 2-ER-107. FERC issued a Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration on March 3, 2025. 190 FERC ¶ 62,124 (2025) (1-ER-69), and a substantive order on rehearing on July 2, 2025, *SDG&E*, 192 FERC ¶ 61,015 (2025) ("TO6 Rehearing Order") (1-ER-2).

Petitioners timely filed a petition for review in this Court on March 26, 2025 (No. 25-1980), challenging the Refund Order, the TO6 Order, and the two orders denying rehearing by operation of law. Petitioners timely filed a second petition for review on August 11, 2025 (No. 25-5064), challenging the Refund Rehearing Order and the TO6 Rehearing Order. The petitions were consolidated on September 30, 2025.

This Court has jurisdiction and venue because the "public utilit[ies] to which the order[s] relate[]" are located in this Circuit. 16 U.S.C. § 825*l*(b).

## STATUTORY AND REGULATORY AUTHORITIES

Pertinent statutory and regulatory authorities appear in an Addendum.

## ISSUES PRESENTED

1. **[SDG&E Only]** Whether FERC's interpretation of the Refund Provision, as imposing an open-ended obligation on SDG&E to refund the Adder based on later-enacted California legislation, was contrary to law and arbitrary and capricious.

2. **[All Petitioners]** Whether FERC's decision, in depriving SDG&E of the Adder based solely on a California law that draws arbitrary distinctions among similarly situated transmission owners, was contrary to law and arbitrary and capricious.

## STATEMENT OF THE CASE

## I. LEGAL AND FACTUAL BACKGROUND

### A. FERC Has Exclusive Authority Over Transmission Rates.

Electricity is generally produced and delivered to customers in three steps: generation, transmission, and distribution. Power plants generate electricity that is transmitted over long distances at high voltage to substations and then distributed to end-use customers on local distribution wires. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265-68 (2016) ("*EPSA*").

This case is about transmission rates. FERC has exclusive jurisdiction over the "transmission of electric energy in interstate commerce," 16 U.S.C. § 824(b)(1), and over the rates, terms, and conditions of interstate transmission service, *see Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 928 (9th Cir. 2002).

The FPA empowers FERC to ensure wholesale energy rates are "just and reasonable." 16 U.S.C. § 824d(a). Congress accomplished that goal through two "related but distinct" provisions. *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 348

(D.C. Cir. 2014). Under FPA Section 205 (codified at 16 U.S.C. § 824d), utilities must file their "new rates" with FERC. *MISO Transmission Owners v. FERC*, 177 F.4th 1204, 1210 (D.C. Cir. 2026); *see Md. Off. of People's Counsel v. FERC*, 164 F.4th 920, 923 (D.C. Cir. 2026).

A utility may opt for a "formula rate." Under such a rate, a utility puts on file a rate formula—*i.e.*, a rate methodology with governing protocols—that calculates the utility's revenue requirement and resulting rates from cost inputs that are refreshed on a set schedule. 18 C.F.R. § 35.13; *see Pub. Utils. Comm'n of Cal. v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001) (formula rate "specifies the cost components that form the basis of the rates").

One component of the formula rate is the return on equity ("ROE"). Regulated utilities like SDG&E do not earn a return on selling electricity. They generally earn a return on the capital they invest in building the generation, transmission, and distribution infrastructure (like poles, wires, and substations) that generates and delivers electricity. This ROE compensates investors for the use of their funds to build this necessary infrastructure to serve customers. It is expressed as a percentage applied to the total amount of equity invested in serving customers.

*FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603-04 (1944). Utility rates include both operating costs and an authorized ROE.[3]

The FPA's other key rate-setting provision is Section 206 (codified at 16 U.S.C. § 824e). Under Section 206, FERC may by its own initiative or upon complaint assess whether existing rates are just and reasonable. *Id.* § 824e(a). FERC can modify those rates if it finds they are "unjust, unreasonable, unduly discriminatory[,] or preferential." *Id.*

Sections 205 and 206 incorporate the "filed-rate doctrine," which "prohibits regulated entities from charging rates 'other than those properly filed with the appropriate federal regulatory authority'" and "permits those rates to be changed 'only prospectively.'" *Md. Off. of People's Counsel*, 164 F.4th at 922-23 (citations omitted). Under Section 206, FERC must establish a "refund effective date," 16 U.S.C. § 824e(b), and "FERC may not order refunds for any period prior to the filing of the complaint," *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 967 (D.C. Cir. 2003).

[3] *See* FERC, *Formula Rates in Electric Transmission Proceedings*, https://www.ferc.gov/formula-rates-electric-transmission-proceedings-key-concepts-and-how-participate (last updated July 5, 2022).

### B. Congress Required FERC To Provide The Adder For Membership In Regional Transmission Organizations.

This case concerns a federal rate incentive for membership in an RTO. RTOs coordinate transmission at a regional level via a neutral grid operator. Beginning in the 1990s, FERC recognized that electricity could be delivered to customers more efficiently and reliably through the creation of such regional organizations. In 1999, FERC established the minimum criteria for RTOs and independent system operators ("ISOs"). *Reg'l Transmission Orgs.*, Order No. 2000, 89 FERC ¶ 61,285, 1999 WL 33505505, at *2-3 (1999); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016); *EPSA*, 577 U.S. at 267-68. Those entities would operate the transmission system and plan new transmission facilities. FERC recognized that RTOs confer "significant benefits" for consumers, including "improve[d] efficiencies in the management of the transmission grid" and "improve[d] grid reliability." Order No. 2000, 1999 WL 33505505, at *29; *see id.* at *37.

FERC adopted a "voluntary approach" to RTO membership and an "open collaborative process that relies on voluntary regional participation to design RTOs that can be tailored to specific needs of each region." *Id.* at *3, *42-49. This approach made good sense: a utility's decision to join an RTO fundamentally transforms its operations as to its federally regulated transmission facilities, including by requiring the utility to cede operational control to the RTO. 18 C.F.R. § 35.34(f), (k)(7).

In 2005, Congress amended the FPA to further encourage transmission investment within the RTO framework—adding Section 219 (codified at 16 U.S.C. § 824s). "Section 219 reflect[ed] Congress' determination that the Commission's traditional ratemaking policies may not be sufficient to encourage new transmission infrastructure." *Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 at P5 (2006) ("Order No. 679"), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006) ("Order No. 679-A"), *order on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007). As FERC later explained, in the three decades before Section 219, "investment in transmission … declined significantly," and the "growth rate in transmission mileage" was "not sufficient to meet" the "expected ... growth in consumer demand." *Id.* at P10. Section 219(c) thus mandated that FERC "shall[] … provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization." 16 U.S.C. § 824s(c).

To implement Section 219(c), FERC adopted the Adder as an ROE incentive. All else equal, a higher ROE for transmission investment gives utilities a stronger incentive to invest an additional dollar in transmission facilities than to deploy that capital elsewhere. FERC explained that it "will approve, when justified, requests for ROE-based incentives for public utilities that join and/or continue to be a member of an" RTO. Order No. 679, 116 FERC ¶ 61,057 at P326. FERC stated that its award of this ROE incentive—the Adder—reflects the fact that "continuing

membership is generally voluntary," *id.* at P331, and that it would assess eligibility for the Adder on a case-by-case basis, *id.* at P326.

In the years after, in line with FERC's stated position that the Adder should be "widely available," Order No. 679-A, 117 FERC ¶ 61,345 at P86, FERC routinely granted the Adder, including to all three Petitioners.

### C. Petitioners Joined A Regional Transmission Organization.

Meanwhile, California was working to restructure its electric industry. Petitioners SDG&E, PG&E, and SCE are California's three largest "investor-owned utilities"—that is, private companies owned by shareholders rather than by a governmental body (e.g., municipal utilities) or by members (e.g., cooperatives). Beginning in the 1990s, California encouraged the development of CAISO, a transmission organization that today covers most of California and parts of Nevada and Arizona, and is interconnected with the interstate grid. In 1995, the CPUC called on Petitioners to propose to FERC the establishment of an ISO and to transfer operational control of their transmission facilities to the new organization. *Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966, 971-72 (9th Cir. 2018) ("*CPUC I*"); *see Order Instituting Rulemaking on Commission's Proposed Policies Governing Restructuring California's Electric Service Industry and Reforming Regulation*, D.95-12-063, 1995 WL 792086, at *99-100 (Cal. P.U.C. Dec. 20, 1995). Then in 1998, the CPUC issued an order approving the transfer of operational control of

Petitioners' transmission assets to the newly created CAISO. *Joint Application of Pac. Gas & Elec. Co.*, D.98-01-053, 1998 WL 242747 (Cal. P.U.C. Jan. 21, 1998) ("1998 Transfer Decision"). The 1998 Transfer Decision—which California's 2022 legislation would later cross-reference—applies only to Petitioners and not to any other California transmission owner.

Petitioners have thus been members of CAISO since 1998 and, as noted, routinely received the Adder after Order No. 679. *E.g.*, *SCE*, 121 FERC ¶ 61,168 (2007); *SDG&E*, 118 FERC ¶ 61,073 (2007); *SDG&E*, 143 FERC ¶ 61,246 (2013); *see also CPUC I*, 879 F.3d at 971-72; *CPUC II*, 29 F.4th at 459.

### D. California Targeted Petitioners' Adder, And This Court Remanded The Issue In *CPUC I*.

Petitioners and California have litigated several Adder cases before FERC and this Court. Because several overlapping proceedings are relevant, we supply below a timeline of key events and proceedings. *Infra* at 23.

Beginning with PG&E's rate filings in 2014 and 2015, certain California parties—including the CPUC—contended that PG&E should not receive the Adder because California read then-existing state law (including the 1998 Transfer Decision) to mandate PG&E's CAISO membership. FERC rejected CPUC's arguments and summarily granted the Adder. *See PG&E*, 148 FERC ¶ 61,245 at PP15, 30 (2014); *PG&E*, 152 FERC ¶ 61,252 at PP12, 23 (2015).

In January 2018, this Court decided *CPUC I*, concluding that FERC had acted arbitrarily and capriciously in summarily awarding PG&E the Adder in its challenged orders. The Court held that FERC did not sufficiently grapple with Order No. 679's statement that the incentive is available in part due to the '"fact that continuing membership is generally voluntary.'" 879 F.3d at 974 (quoting Order No. 679, 116 FERC ¶ 61,057 at P331). The Court directed FERC on remand to consider whether under California law PG&E's CAISO membership was in fact voluntary, and "thus whether an incentive adder could induce it to remain." *Id.* at 979.

The proceedings on remand from *CPUC I* are the parallel "CPUC Adder Litigation" that is the backdrop for the TO5 settlement at issue here.

***PG&E Remand Order.*** In July 2019, on remand from *CPUC I*, FERC received briefing from all three Petitioners and again awarded PG&E the Adder. 3-ER-414 (PG&E Remand Order); *see* 3-ER-418 (*id.* at P9 n.23). FERC found that "California law does not mandate PG&E's participation in CAISO, and that the [Adder] induces PG&E to continue its membership." 3-ER-415 (*id.* at P2). FERC made a detailed inquiry into California law, concluding that the "California parties point to no provision … that mandates RTO/ISO membership, and our survey … reveals none." 2-ER-433 (*id.* at P43). In August 2019, California sought rehearing of the PG&E Remand Order.

***Other PG&E/SCE Rate Cases.*** In September 2019, with that rehearing request pending, FERC relied on the PG&E Remand Order on rehearing in two other pending rate cases involving PG&E and SCE to reject California's arguments that PG&E and SCE were not entitled to the Adder. *SCE*, 168 FERC ¶ 61,206 at P15 (2019) ("SCE TO18 Rehearing Order") (2-ER-359); *PG&E*, 168 FERC ¶ 61,217 at P15 (2019) ("PG&E TO19 Rehearing Order") (2-ER-376).

### E. California And SDG&E Settled The TO5 Rate Case And Crafted The Refund Provision To Allow The Resolution Of The Adder Issue In The CPUC Adder Litigation.

Concurrently, SDG&E submitted its proposed TO5 formula rate in October 2018. Two months later in December 2018, FERC accepted SDG&E's proposed TO5 Formula and suspended it for five months, to become effective June 1, 2019, subject to refund, and established hearing and settlement judge procedures. *See SDG&E*, 165 FERC ¶ 61,276 (2018) ("Hearing Order") (3-ER-443).

In the Hearing Order, FERC explained that the CPUC "takes issue with SDG&E's proposal for a 50 basis point [A]dder for CAISO participation." 3-ER-450 (*id.* at P18). Specifically, the CPUC "recommend[ed]" that SDG&E's "proposal for a 50 basis point adder for CAISO participation should be determined in the pending [PG&E] litigation," because the "issue of … eligibility for the CAISO incentive adder has been briefed in another proceeding." 3-ER-461 (CPUC TO5 Protest at 33); *see* 3-ER-450 (Hearing Order at P18) ("CPUC asserts that SDG&E's

eligibility for this adder should be determined in the pending litigation regarding PG&E's equivalent 50 basis point adder for CAISO participation, which is on remand from the Ninth Circuit"). Similarly, at a July 22, 2019 TO5 prehearing conference mere days after FERC issued the PG&E Remand Order, another California party (DWR) described SDG&E's Adder entitlement as a "live issue," noting that FERC recently "issued an order in a PG&E case … which is still subject to rehearing, and … that issue may get decided in another case." 3-ER-400 (TO5 Prehearing Tr. 17).

SDG&E and the California Parties then reached a Settlement Agreement in the TO5 formula rate case in October 2019. *See* 2-ER-329 (TO5 Settlement Agreement). That settlement came while California's requests for rehearing of the PG&E Remand Order remained pending, with FERC finding that PG&E and SCE were eligible for the Adder, and with California's petitions for review of the TO18 SCE Rehearing Order and TO19 PG&E Rehearing Order to come in November 2019.

Section 4.1 explained the Settlement's purpose: The parties sought to "resolve[] all issues set for hearing and settlement judge procedures in [the Hearing Order for] this proceeding." 2-ER-348 (Settlement Agreement § 4.1). Those issues, as explained, included the Adder dispute. 3-ER-450 (Hearing Order at P18); *see* 2-ER-339 (Settlement Agreement Preamble) (memorializing the parties' intent to "resolve all issues set for hearing and settlement judge procedures").

The Settlement's Refund Provision embodied the shared view that the Adder issue should be decided in the then-pending CPUC Adder Litigation rather than be separately litigated in the TO5 proceeding between SDG&E and California, given the parties were already litigating the issue. It specified:

> SDG&E will refund the CAISO 50 basis point [A]dder as of the refund effective date (June 1, 2019) in this proceeding if the Commission issues an order ruling that California investor-owned utilities are no longer eligible for the CAISO [A]dder.

2-ER-345 (Settlement Agreement § 1.5.1).

This same dynamic was playing out in other rate cases. In December 2018, FERC accepted PG&E's settlement offer in its TO19 rate case—a proceeding in which SDG&E and SCE had also intervened. *PG&E*, 165 FERC ¶ 61,244 (2018). PG&E's Offer of Settlement and Stipulation similarly explained that the parties would reserve litigation of the Adder issue for the CPUC Adder Litigation:

> PG&E's TO19 rates effective March 1, 2018 include the 50 basis point ROE incentive at issue in *Cal. Pub. Utils. Comm'n v. FERC*, Ninth Circuit Case No. 16-70481, which has been remanded to the Commission 'for further proceedings consistent with this opinion.' If, as a result of that remand, the Commission determines[] … in a final, non-appealable order, that PG&E is entitled to anything less than the full 50 basis point ROE incentive for membership in the CAISO, PG&E shall make refunds for TO19…

3-ER-471 (Section § 3.3, PG&E Offer of Settlement and Stipulation (Sept. 21, 2018)) ("TO19 Settlement Offer").[4] Because California was challenging Petitioners' rights to the Adder in each rate case, Petitioners and California began tying Adder eligibility to the CPUC Adder Litigation that was already pending.

### F. The Issue Reserved In The Refund Provision Was Resolved When This Court In *CPUC II* Held That Petitioners Remained Entitled To The Adder.

As detailed below, Petitioners ultimately prevailed in the CPUC Adder Litigation that was pending at FERC when they entered their general rate settlements.

Specifically, one month after the filing of the Settlement Agreement, California petitioned this Court for review of the 2018 SCE Rehearing Order and the TO19 PG&E Rehearing Order. While that petition was pending, FERC denied rehearing of the PG&E Remand Order in March 2020. 2-ER-309 (PG&E Remand Rehearing Order). Six days after issuing the PG&E Remand Rehearing Order, FERC approved the TO5 Settlement, including the Refund Provision. *SDG&E*, 170 FERC ¶ 61,240 (2020) (2-ER-304). In May 2020, California sought review of the

[4] An earlier PG&E settlement offer of its TO17 rate case in September 2016 also tied any refund to the CPUC Adder Litigation (there, *CPUC I*), stating that "[i]f the litigation concerning the 50 basis point ROE incentive [A]dder for CAISO participation … results in a final, non-appealable resolution under which PG&E is entitled to anything less than a full 50 basis point ROE incentive [A]dder for CAISO participation, PG&E will provide a refund…" 3-ER-493 (*Pac. Gas and Elec. Co.*, Offer of Settlement and Stipulation § 2.3(c) ("TO17 Settlement Offer"); *see also* 3-ER-496 (*id.* § 3.3) (similar).

PG&E Remand Order and PG&E Remand Rehearing Order. This Court consolidated those petitions with California's prior petitions challenging the 2018 SCE Rehearing Order and the TO19 PG&E Rehearing Order.

Petitioners then won on appeal. In May 2022, this Court affirmed FERC and endorsed PG&E's and SCE's (and by extension, SDG&E's) continued eligibility for the Adders consistent with then-existing California law. *CPUC II*, 29 F.4th at 468. The Court held that "neither the text of California's Public Utilit[ies] Code nor any California caselaw mandates that utilities maintain ongoing membership in CAISO." *Id.* Therefore, "FERC did not err in concluding that the Utilities' membership in CAISO is voluntary." *Id.* This Court's decision thus resolved the issue the parties had reserved in the Refund Provision (and the PG&E TO19 Settlement Offer).

### G. California Enacted New Legislation To Target Petitioners' Federal Rate.

Undaunted, California launched a new attack on Petitioners' Adder eligibility, this time via legislation. Six months after *CPUC II*, California amended Section 362(c) of the California Public Utilities Code to provide that (as of September 2022) "an electrical corporation subject to [the 1998 Transfer Decision] … shall participate in [CAISO]." Cal. Pub. Util. Code § 362(c). By limiting its scope to the entities covered by the 1998 Transfer Decision, California's new law applies *only* to Petitioners.

Based on that new legislation, California finally succeeded in persuading FERC to strip PG&E of its Adder. In December 2023, FERC rejected PG&E's request for the Adder in its new formula rate proceeding that PG&E filed in October 2023, concluding that the new law rendered PG&E's CAISO participation involuntary. *PG&E*, 185 FERC ¶ 61,243 at PP38-39 (2023) ("PG&E Adder Order") (2-ER-298-99). FERC explained that "[u]nder a prior formulation of the California statute," it had "found that California law did not mandate PG&E's participation in CAISO," but that "California has since … enacted a law[] … which requires that electric corporations such as PG&E participate in CAISO." *Id.* In June 2024, FERC rejected Petitioners' rehearing requests. *PG&E*, 187 FERC ¶ 61,167 at PP36-38 (2024) ("PG&E Adder Rehearing Order") (2-ER-235-36).

Petitioners sought this Court's review. In a 2025 unpublished decision, this Court concluded that: (1) California law as amended requires PG&E's RTO participation; (2) California's law is not preempted by the FPA; and (3) the FPA does not itself require FERC to provide the Adder to utilities subject to an RTO mandate. *See PG&E*, 2025 WL 1912363, at *1-3.

The timeline below summarizes the sequence of events just described:

# Figure 1: Timeline of Adder-Related Decisions



## II. PROCEDURAL HISTORY

This appeal concerns FERC orders that decided SDG&E (1) owed refunds under the TO5 Settlement Agreement's Refund Provision and (2) was ineligible for the Adder in its TO6 rate case.

### A. In The TO5 Case, FERC Interpreted The Refund Provision To Require SDG&E To Provide Refunds Of Lawfully Collected Funds.

On May 31, 2024, almost five years after the TO5 Settlement Agreement was filed, California filed a petition for declaratory order contending that the Refund Provision had been triggered by California's new legislation and FERC's subsequent PG&E Adder Orders giving effect to that legislation. California asked FERC to require that SDG&E issue refunds, with interest, back to June 1, 2019. 2-ER-254 (Petition at 3). California estimated the refunds as exceeding $110 million before interest and true-ups. 2-ER-262 (*id.* at 11 n.31). In December 2024, FERC granted California's petition and concluded that SDG&E's refund obligation had been triggered by the PG&E Adder Orders. 1-ER-103-05 (Refund Order at PP41-44).

Petitioners sought rehearing in January 2025. 2-ER-156. SDG&E argued that the Refund Provision's plain text, as well as the broader context and governing California contract-law principles, all made clear that the Refund Provision was limited to an order resolving the CPUC Adder Litigation under then-existing California law, and that FERC had failed to identify or apply any contract-law framework or address SDG&E's extrinsic evidence. *See* 2-ER-170-88. The request

was deemed denied by operation of law on February 6, 2025. 190 FERC ¶ 62,074 (2025) (1-ER-70).

On July 2, 2025, FERC issued a substantive order addressing the rehearing arguments. Refund Rehearing Order (1-ER-30). On the contract-law question, FERC held that "[w]hether interpreting the Adder Refund Provision under federal or California contract law, we find that the language of the Adder Refund [P]rovision is clear, unambiguous, and not reasonably susceptible to SDG&E's interpretation." 1-ER-40 (*id.* at P23); *see* 1-ER-39 (*id.* at P21) (similar). In particular, FERC found that the Refund Provision's use of the phrase "*an order*" was "not limited to a specific case or appeal" and could thus be triggered by orders issued even after the CPUC Adder Litigation concluded and based on newly enacted law. 1-ER-41 (*id.* at P23). FERC also found that even if extrinsic evidence were considered, that evidence "does not demonstrate an intent to limit the Adder Refund Provision to the CPUC/PG&E Proceeding." 1-ER-42 (*id.* at P25).

### B. In The TO6 Rate Case, FERC Held That California's Mandate Eliminates SDG&E's Entitlement To The Adder.

In October 2024, SDG&E filed tariff revisions that included a 50-basis-point Adder. California protested, arguing that SDG&E's participation is mandatory under California law and the Adder is thus unjustified. In December 2024, FERC rejected SDG&E's request for the Adder. 1-ER-82-86 (TO6 Order at PP33-42).

Petitioners sought rehearing in January 2025. 2-ER-107. Petitioners argued, among other things, that FERC unduly discriminated against Petitioners by denying them the Adder while granting it to other similarly situated entities simply because California had singled out Petitioners. Petitioners pointed to Viridon California LLC, an independent transmission owner that received the Adder because "unlike the[] three investor-owned utilities, [Viridon] is not required by state statute to join CAISO." 2-ER-152 (quoting *Viridon Cal. LLC*, 186 FERC ¶ 61,143 at P57 (2024)). The rehearing request was deemed denied by operation of law on March 3, 2025. *See* 190 FERC ¶ 62,124 (2025) (1-ER-69).

On July 2, 2025, FERC issued a substantive rehearing order. *See SDG&E*, 192 FERC ¶ 61,015 (2025) ("TO6 Rehearing Order") (1-ER-2). FERC rejected SDG&E's argument that it unduly discriminated against SDG&E and the other Petitioners, explaining that Petitioners were not similarly situated to other California transmission owners because Petitioners "are the only electrical corporations to which [Cal. Pub. Utils. Code] section 362(c) applies." 1-ER-28 (*id.* at P53). FERC further averred that the "Commission is not the correct forum" to challenge "California legislature's decision that [Petitioners] are the only utilities to which section 362(c) applies." 1-ER-28 (*id.* at P54).

Petitioners timely petitioned this Court for review of the six orders across both proceedings. The Court consolidated the petitions.

## SUMMARY OF ARGUMENT

I. FERC's conclusion—that the TO5 Settlement's Refund Provision requires SDG&E to refund the Adder back to June 1, 2019—is contrary to law and arbitrary and capricious. The Settlement is a contract, and its meaning turns on the parties' reasonable intent gathered from the whole agreement and its context, not (as FERC held) from a single clause read in isolation.

Text and structure refute FERC's reading. The Refund Provision applies if FERC issues an order ruling that "California investor-owned utilities" "are no longer eligible" for the Adder. That provision referred to the then-pending CPUC Adder Litigation, in which California contested Petitioners' eligibility following this Court's remand in *CPUC I*. It used the plural because those then-pending proceedings involved *all three Petitioners*. By contrast, if that phrase created the springing refund obligation FERC posited—unmoored from the then-pending proceedings or existing California law—all manner of anomalies would follow. The Settlement's structure confirms the parties did not intend that boundless reading: Section 4.1 states that the parties sought to "resolve[] all issues set for hearing," and the Hearing Order identified the Adder dispute—which the CPUC had asked to resolve through the pending PG&E litigation—as one of those issues.

Context and extrinsic evidence point the same way. The Settlement was executed while the same parties were litigating Petitioners' Adder eligibility. The

CPUC itself proposed tying SDG&E's Adder to *that litigation* rather than having the parties redundantly litigate that same issue themselves in the TO5 proceeding, and another California entity confirmed the issue "may get decided in another case." FERC's failure to consider this evidence is reversible error.

FERC's reading also produces unreasonable and retroactive results. FERC read the Refund Provision to impose an open-ended obligation to refund the Adder back to 2019 based on any future order, including one that follows a statute enacted years after the Settlement. That hands the California Parties more than they could have won by litigating, for no identified consideration, and gives retroactive effect to later-enacted law—all contrary to the presumptions of both California and federal law.

II. FERC's denial of SDG&E's Adder in the TO6 rate case is independently unlawful because it unduly discriminates in violation of the FPA. FERC conceded that Petitioners are "otherwise similarly-situated" to other CAISO participants that keep the Adder, yet defended treating them worse solely because California's new law singles them out. But the Adder is part of the federal rate, and FERC may not offload its duty to prevent undue discrimination to a state legislature without explaining how California's arbitrary distinction is consistent with the FPA.

The Court should grant the petitions and vacate the orders.

## STANDARD OF REVIEW

This Court "generally reviews FERC's interpretations of contracts *de novo*," including where, as here, FERC's interpretation does not "rel[y] on FERC's technical expertise." *Turlock Irrigation Dist. v. FERC*, 903 F.3d 862, 868 (9th Cir. 2018). To the extent FERC might argue that this Court should apply a deferential standard, "FERC [has] forfeited any deference it might otherwise have been owed by failing to demonstrate how its interpretations reflect its expertise in this area, or are typical of how those terms are used in the industry—or, indeed, by failing to even explain clearly how it interprets the terms at all." *Id.* at 870.

In addition, this Court "review[s] a decision by FERC to determine whether its action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *CPUC I*, 879 F.3d at 973 (quoting 5 U.S.C. § 706(2)). "Where a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA." *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). FERC's decision is arbitrary and capricious where it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

# ARGUMENT

## I. FERC'S INTERPRETATION OF THE REFUND PROVISION IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

Because the Settlement Agreement is a contract, certain generally applicable principles of interpretation govern. Text is of course critical—but as FERC has itself recognized, it "must 'review the entire agreement and particular words should be considered, not as if isolated from the context, but in light of the obligations as a whole and the intention of the parties as manifested therein.'" *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,053 at PP14-15. And "[t]o determine ambiguity," it must consider whether a provision 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id.*; *accord Restatement (Second) of Contracts* § 202(1) & cmt. b (1981).

California law accords with these principles. By statute, "[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." Cal. Civ. Code § 1647. And the "meaning of a writing" can "only be found by the interpretation in the light of all the circumstances that reveal the sense in which the writer used the words." *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37-39 (1968) (Traynor, C.J.) (internal quotation marks omitted). In some ways detailed below, California law goes even

farther in protecting parties' reasonable expectations (including as to extrinsic evidence). California law governs here because unless a contract involves such a "strong … federal interest that it is appropriate to resolve [issues] on the basis of uniform decisional federal law" "the appropriate contract law to apply is the law that would govern the parties' dealings were there no regulation at all of the contract's subject matter."[5] The Settlement resolved litigation among a series of California parties, and no federal interest compels a departure from state law.

Under either California or federal law, FERC's interpretation of the Settlement is unlawful. The Refund Provision required SDG&E to issue refunds back to 2019 if Petitioners lost the then-pending CPUC Adder Litigation where the parties agreed SDG&E's Adder eligibility would be resolved. But Petitioners won. The Refund Provision did not create the boundless additional obligation FERC found it to impose—to issue refunds back to 2019 if California investor-own utilities *ever* lost their Adder entitlement on any basis whatsoever. No party would have signed such a one-sided deal, which gives California a springing and retroactive refund right it could never have obtained had it *actually litigated*.

---

[5] *Pennzoil Co. v. FERC*, 645 F.2d 360, 385-87 (5th Cir. 1981); *see SCE v. FERC*, 502 F.3d 176, 181 (D.C. Cir. 2007) (faulting FERC for "select[ing] federal law over California law simply because the Agreement was filed with the Commission" and reiterating that the "Commission's obligation to apply state law" is not "altered because the Agreement has been filed as part of a rate case" (citing *Pennzoil Co.*, 645 F.2d at 383-84, 387)).

FERC's orders are contrary to law and arbitrary and capricious. First, FERC's reading conflicts with the Settlement's text and structure, which tie the Refund Provision to the then-pending CPUC Adder Litigation. Second, that reading is untenable given the context in which the Settlement was negotiated. Third, that reading conflicts with the extrinsic evidence of intent. Fourth, FERC's reading produces results that are unreasonable, harsh, and retroactive, contradicting interpretive principles designed to prevent such results. FERC also failed to address numerous arguments SDG&E raised below, which independently requires vacatur.

### A. The Settlement's Text And Structure Limit The Refund Provision To The Then-Pending CPUC Adder Litigation.

The parties to SDG&E's TO5 rate case agreed to the Refund Provision while they were litigating Petitioners' Adder eligibility in the CPUC Adder Litigation case. The Refund Provision states that "SDG&E will refund the CAISO 50 basis point adder as of the refund effective date (June 1, 2019) in this proceeding if the Commission issues an order ruling that California investor-owned utilities are no longer eligible for the CAISO adder." 2-ER-345 (TO5 Settlement § 1.5.1). In three respects, text and structure show that the parties intended to use the CPUC Adder Litigation to resolve SDG&E's adder eligibility and to avoid relitigating that issue

in TO5—not create a retroactive blank check requiring refunds to 2019 if California investor-owned utilities ever lost their Adder entitlement for any reason.

*First*, the reference to "an *order* ruling that *California investor-owned utilities* are no longer eligible," *id.*, naturally refers to an order in the then-pending CPUC Adder Litigation. That proceeding was where the parties were already briefing whether Petitioners—who are California investor-owned utilities—were Adder-eligible under then-existing California law. At the time, FERC had just issued the PG&E Remand Order; California's rehearing application as to that order was still pending; and the parties were anticipating judicial review. The "order" described in the Refund Provision was an order in those proceedings.

That conclusion is particularly clear given the reference to the Adder entitlement of "California investor-owned utilities"—plural. That plural phrase was a natural way to target the pending CPUC Adder Litigation, in which all three Petitioners were parties and which could resolve their Adder entitlements in one stroke. *See* 3-ER-418 (PG&E Remand Order at P9 n.23) (noting participation of the "Joint Utilities," which "include [SCE] and [SDG&E]"). Unless that plural phrase referenced the CPUC Adder Litigation, it would have been far more natural to refer only to SDG&E. SDG&E's Adder entitlement is what matters to SDG&E rates.

On FERC's incorrect reading, the plural locution is more than odd. It would threaten all sorts of anomalies the parties could not have intended. Imagine, for

example, just PG&E and SCE left CAISO, or California targeted only PG&E and SCE—causing FERC to strip those two utilities of their Adders. Then FERC arguably would have issued orders that, literally speaking, "rul[ed] that California investor-owned utilities [plural] are no longer eligible for the … [A]dder." But the parties could not have intended that such orders—which have nothing to do with SDG&E—required SDG&E to refund its own Adder back to 2019. Those anomalies disappear by reading the plural phrase to refer to the CPUC Adder Litigation.

FERC's only textual argument rests on the indefinite article "an." Because the phrase "an order" can linguistically be read more broadly and "is not limited to a specific case or appeal," FERC reasoned, the Refund Provision *must* require SDG&E to issue refunds in light of California's later-enacted legislation. 1-ER-41 (*id.* at P23); *see* 1-ER-43-44 (*id.* at P26) (similar). But even for the most committed textualist, interpretation is not about identifying the broadest possible reading of the literal text. *Supra* at 4-5; *see Chevron*, 146 S. Ct. at 1061. And FERC did not even attempt to grapple with the mountain of textual, structural, contextual, and extrinsic evidence indicating that the parties intended "an order" to have a narrower meaning. Nor, even on its own literalist terms, does the article "an" compel FERC's reading. If Alan and Bob are playing basketball and Alan agrees to pay Bob $10 if he makes "a basket," everyone understands Alan need not pay if Bob scores three years later. The indefinite article thus cannot carry the enormous weight that FERC places on it.

*Second*, structure confirms this interpretation. Section 4.1 explains that the parties sought to "resolve[] all issues set for hearing and settlement judge procedures in the [Hearing Order for] this proceeding." 2-ER-348 (TO5 Settlement § 4.1); *see* 3-ER-443 (Hearing Order). The Hearing Order in turn noted that "CPUC … takes issue with SDG&E's proposal for a 50 basis point adder for CAISO participation" and that "CPUC asserts that SDG&E's eligibility for this adder *should be determined in the pending litigation regarding PG&E's equivalent 50 basis point adder for CAISO participation, which is on remand from the Ninth Circuit*." 3-ER-450 (Hearing Order at P18 (citing CPUC TO5 Protest at 33[3-ER-461], which in turn cites the ongoing CPUC Adder Litigation)). It reiterated that "CPUC suggests that the Commission use that proceeding to determine the outcome of this issue." *Id.*

The Refund Provision thus "resolved [the] issues set for hearing" by adopting the CPUC's *own* proposal to resolve SDG&E's Adder eligibility in the CPUC Adder Litigation rather than litigate the issue themselves in the TO5 proceeding. 2-ER-348 (TO5 Settlement § 4.1). Neither CPUC nor anyone else ever pressed for the extraordinary right FERC ultimately conferred—that SDG&E should have to issue refunds even if Petitioners *prevailed* in the CPUC Adder Litigation and years later lost their Adder eligibility based on a new law or some other contingency. That is for good reason: The CPUC could not have obtained such a right by litigating the adder issue in SDG&E's TO5 rate case. Instead, the filed-rate doctrine would have

limited the CPUC to prospective relief if California enacted a new statute changing state law. In particular, California could have stripped SDG&E's adder no earlier than when California filed a complaint based on the new statute; the new law was effective in September 2022, and FERC in fact did not strip PG&E's adder until December 2023. Yet under FERC's reading, SDG&E somehow inexplicably agreed to retroactively give up the Adder back to June 1, 2019, if California investor-owned utilities ever lost their Adder for any reason. Especially given the Settlement's reference to the "issues set for hearing," it makes no sense to read the Refund Provision to confer a right beyond what any party sought in the Hearing Order. Parties settle to avoid the worst possible outcome from litigation—not to agree to an even worse outcome than its adversary could have obtained through litigation.

*Third*, other aspects of the Settlement Agreement's text and structure reinforce that the parties intended the Refund Provision to achieve the narrower end of setting a different refund effective date than would otherwise apply under the filed-rate doctrine if the California Parties ultimately prevailed in the CPUC Adder Litigation. Section 206 of the FPA provides default rules for "refund effective date[s]"—the precise term used in the Refund Provision. 16 U.S.C. § 824e(b). It specifies that "[i]n the case of a proceeding instituted on complaint," the "refund effective date shall not be earlier than the date of the filing of such complaint." *Id.* Had the California Parties agreed to a settlement without the Refund Provision, and they later

prevailed at FERC or in *CPUC II*, the filed-rate doctrine would have prevented refunds between the date of the Settlement and the refund date in a complaint. That would have left the California Parties *worse off* than had they litigated the Adder issue in parallel in TO5 (where they could have stripped SDG&E's adder to June 2019). By fixing a non-default refund effective date, the Refund Provision aimed to allow the parties to settle TO5, rely on the CPUC Adder Litigation to resolve SDG&E's Adder, and leave neither party worse off for settling. The intent was not to adopt a one-sided bargain that disadvantaged SDG&E while giving California more than it ever could have sought in litigation.

The Refund Provision's text itself repeatedly confirms that intent, specifying that "SDG&E will refund" the Adder "as of the refund effective date … in this proceeding" and further specifying in parentheses the specific refund effective date the Settlement Agreement adopted ("June 1, 2019"). 2-ER-345 (TO5 Settlement § 1.5.1). Another provision tells the same story. Section 1.5.3 imposes a moratorium on filings "seeking to change the ROE component … *with the exception of the 50-basis point adder for CAISO participation*, of the TO5 Formula through June 30, 2021." 2-ER-345 (TO5 Settlement § 1.5.3). The principal stay-out provision aimed to achieve some measure of stability going forward and prevented both sides from filing shortly thereafter to reopen rates. But the parties made an exception to account for the imminent resolution of the CPUC Adder Litigation that

they expected to conclude in that period. This synchronization is additional, clear evidence that the parties calibrated the Settlement's term to the anticipated resolution of the pending proceeding, and that the Refund Provision was the true-up mechanism for an order expected *within that term*, not a perpetual hook to compel refunds based on any order issued on any basis at any time.

FERC below ignored Section 4.1 and Petitioners' filed-rate arguments—both of which provide a sensible explanation for the Refund Provision (in contrast to FERC's nonsensical one). Those omissions alone render the orders arbitrary and capricious, as the APA requires FERC to consider and address important arguments and evidence. *See Port of Seattle v. FERC*, 499 F.3d 1016, 1035 (9th Cir. 2007). It also underscores how FERC misunderstood its contract-interpretation task: It examined the Refund Provision in isolation, incorrectly believing that provision to resolve the issue, without looking to the Settlement's broader text and structure. That violates both federal and California contract law. *See Restatement (Second) of Contracts* § 202(1) & cmt. b; *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1046 (9th Cir. 2020) (referring to the '"primary rule of interpret[ing]' contracts under California law: to give effect to the parties' mutual intent gathered from the *entire* document" (citation omitted)).

### B. Context Confirms That SDG&E's Interpretation Is Correct.

Context confirms what text and structure show. FERC disregarded its prior recognition that "particular words should be considered, not as if isolated from the context, but in light of the obligations as a whole and the intention of the parties as manifested therein" and with attention to how the words would be "viewed objectively by a reasonably intelligent person who has examined the context." *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,053 at P14 (quotation marks omitted). Or as the *Restatement (Second) of Contracts* recognizes, "[w]ords … are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight," and a court must "put itself in the position [the parties] occupied at the time the contract was made" and take into account "the entire situation, as it appeared to the parties." *Restatement (Second) of Contracts* § 202(1) & cmt. b. These rules, moreover, "do not depend upon any determination that there is an ambiguity, but are used in determining what meanings are reasonably possible as well as in choosing among possible meanings," *id.* § 202 cmt. a—a principle that, if anything, applies with greater force under California law. *Infra* at 44-46.

Here, the context—"the entire situation, as it appeared to the parties"—shows the parties were trying to ensure that they could bracket the Adder issue for resolution in the pending CPUC Adder Litigation. The parties were already

litigating Petitioners' Adder eligibility in that proceeding, with FERC just having issued the PG&E Remand Order and California having already sought rehearing of that order. The natural understanding of the parties' intent is that they intended to rest on their just-filed papers rather than separately and redundantly litigate that question. Hence, if FERC concluded that Petitioners were no longer eligible for the Adder on rehearing in the CPUC Adder Litigation, or if this Court had agreed with California's position in *CPUC II*, then SDG&E would have had to refund back to the refund effective date of June 1, 2019. If not, the Refund Provision's work would be done.

The parties' pre-settlement positions, too, are part of the "circumstances under which [the contract] was made." Cal. Civ. Code § 1647. California courts for decades have recognized that the "factual context in which an agreement was reached" is critical to establishing its meaning, *Nish Noroian Farms v. Agricultural Labor Relation Board*, 35 Cal. 3d 726, 735 (1984), and is "inextricably linked to the broader context in which it was negotiated," *Olson v. Doe*, 12 Cal. 5th 669, 681 (2022). California contended that state law *already* required SDGE's RTO participation, and thus SDG&E was *already* not entitled to the Adder. SDG&E contended that state law did *not* already require its RTO participation, such that its participation was voluntary and it was entitled to the Adder (as *CPUC II* ultimately held). Under SDGE's reading, the Refund Provision makes sense as a compromise:

it allowed the parties to settle, maintain their litigation positions in the CPUC Adder Litigation, and avoid litigating that issue in the TO5 case.

FERC, however, interpreted the Refund Provision to give California vastly more than it could have received had it not settled. California did not ask FERC to order refunds if SDG&E's Adder eligibility changed for some reason *besides* the then-ongoing litigation. Nor could FERC have ordered such a remedy in the TO5 rate case given the filed-rate doctrine. FERC never explained—indeed, expressly and erroneously *disclaimed* having to explain, 1-ER-41 (Refund Rehearing Order P23 n.60)—why SDG&E would agree to a "compromise" in which the California Parties received more than their litigation position.

A telling piece of context comes from PG&E's own "contemporaneous" settlement from the same period that was finalized shortly before SDG&E's Settlement Agreement. 1-ER-43 (Refund Rehearing Order P25). That settlement, too, expressly tied an RTO refund to the outcome of its Adder case on remand—though unlike SDG&E's Settlement Agreement, it cross-referenced the remand case by number. *See supra* at 20 & n.4 (quoting TO19 Settlement Offer and the earlier TO17 Settlement Offer). SDG&E was a party in that proceeding, as was California.

The obvious contextual interpretation is that the parties intended the Refund Provision to do the same work as the PG&E provision, with the PG&E provision merely a more detailed version of what the SDG&E Settlement Agreement also

sought to accomplish. FERC instead inferred that the parties intended to impose on SDG&E a vastly broader refund obligation than PG&E agreed to accept. *Cf.* 1-ER-43 (Refund Rehearing Order at P25). But not one ounce of common sense supports that inference. FERC has never explained why SDG&E would choose (for apparently no consideration) an unlimited refund obligation tied to any eventual FERC order depriving Petitioners of their Adder.

FERC's orders must also be vacated because, again, FERC below did not even believe it needed to address the contextual evidence supporting SDG&E's reading and refuting FERC's own. FERC instead viewed the Refund Provision in isolation, concluded (incorrectly) that its text was dispositive, and relegated everything else to "extrinsic evidence" it did not need to consider (again incorrectly, *infra* Part I.C). And while FERC *recited* SDG&E's arguments based on "context," 1-ER-35-36 (Refund Rehearing Order PP12, 13), it did not fulfill its APA duty to *address* those arguments. To "note[] … objections[]" and "[t]o characterize objections … is not to answer them." *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 210 (D.C. Cir. 2011). Thus, FERC proclaimed that it "d[id] not need to" "explain why it makes sense to interpret the Adder Refund Provision to yield an outcome more favorable to the participating California Parties than if the parties had continued litigating the issue," on the theory that the Refund Provision was clear and "so there is therefore no need to look to the extrinsic evidence to determine the intent of the

parties." 1-ER-41 (Refund Rehearing Order P23 n.60). But FERC was wrong that the Settlement unambiguously resolves the issue, and it could not so ignore evidence of what the parties in context would reasonably have intended.

### C. Extrinsic Evidence Further Underscores That SDG&E Is Correct.

Extrinsic evidence confirms the same conclusion. To begin, this evidence shows that it was the *CPUC* itself that originally proposed tying SDG&E's refund obligation to the CPUC Adder Litigation, on the ground that the parties had already briefed that exact issue in the context of PG&E's Adder. In protesting SDG&E's TO5 filing, the CPUC included an entire section entitled "**SDG&E's Eligibility for a 50 Basis Point Adder Should Be Determined in the Pending Pacific Gas and Electric Company Litigation.**" 3-ER-461 (CPUC Protest at 33) (bolded in original). The CPUC observed that "FERC has issued a remand order setting the issue for further briefing," and that in the CPUC Adder Litigation the "CPUC has argued that PG&E is not entitled to an incentive [A]dder because PG&E's membership in the CAISO is not voluntary since it is required under California law." *Id.* The CPUC further noted that "SDG&E has briefed the issue of whether or not its membership in the CAISO is voluntary in the PG&E proceeding." *Id.* (expressly citing said brief). And the CPUC emphasized that "because the issue of the eligibility for the CAISO incentive adder has been briefed in another proceeding, the CPUC recommends that FERC use that proceeding to determine the outcome of this

contested issue." *Id.* As explained, the Hearing Order then relied on this Protest to identify the issues at stake in the TO5 proceeding, and the Settlement Agreement then resolved those issues.

Similar statements occurred at the TO5 Prehearing Conference, conducted days after FERC issued the PG&E Remand Order. Another California party (DWR) stated that SDG&E's right to the Adder was a "live issue," because the "Commission issued an order in a PG&E case last week which is still subject to rehearing, and I think that issue may get decided in another case." 3-ER-400 (TO5 Prehearing Tr. at 17). That statement again makes clear that the parties intended to incorporate the result of then-pending disputes over Petitioners' Adder eligibility.

This extrinsic evidence should have been dispositive, whether California or federal law governed. Under federal law, "extrinsic evidence [is] relevant … to resolve ambiguity." *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 560-61 (9th Cir. 2016) (quotation marks omitted). And under the governing California law, FERC's approach was obviously deficient. Even "if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible," and it is "reversible error … to refuse to consider such extrinsic evidence on the basis of [one's] own conclusion that the language of the contract appears to be clear and unambiguous." *Wolf v. Superior Ct.*, 114 Cal. App.

4th 1343, 1351 (2d Dist. 2004); *see Zissler v. Saville*, 29 Cal. App. 5th 630, 644 (2d Dist. 2018) (similar); *Cnty. of San Bernardino v. Ins. Co. of Pa.*, 174 F.4th 597, 605 (9th Cir. 2026) (recognizing California's "generous rule with respect to considering extrinsic evidence in contract disputes").

In the seminal case—a PG&E case—the California Supreme Court thus rejected the notion that meaning can be ascertained from the four corners of a writing alone, explaining that a "rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." *Pac. Gas*, 69 Cal. 2d at 37.[6] This Court, applying California law, has recognized that a written contract is not rendered "impervious to attack by parol evidence" merely because its language appears clear, so long as it is "reasonably susceptible" to the proffered meaning. *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 568-69 (9th Cir. 1988). Under California law, FERC should have provisionally admitted extrinsic evidence in deciding whether the Refund Provision is "reasonably

[6] FERC half-heartedly suggests *Pacific Gas* requires ambiguous text to look beyond the four corners of the contract, 1-ER-40 (Refund Rehearing Order at P22), but it ultimately recognizes that this case "also been interpreted to permit the consideration of extrinsic evidence when determining whether an ambiguity exists," 1-ER-41 (*id.* at P23 n.57).

susceptible" to SDG&E's interpretation. *See Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (4th Dist. 1992); *Wolf*, 114 Cal. App. 4th at 1351.

FERC has no persuasive response to this extrinsic evidence and primarily concluded that it could ignore that evidence. Although FERC averred that the language was clear, 1-ER-40-41 (Refund Rehearing Order at P23), the Settlement does not unambiguously compel FERC's interpretation, particularly when read in light of its context and purpose. Extrinsic evidence was therefore admissible under federal law. And under California law, FERC should have provisionally reviewed the extrinsic evidence to determine whether the Settlement Agreement was "reasonably susceptible" to SDG&E's reading. FERC's decision was thus doubly arbitrary and capricious because FERC did not follow the approach California demands, independently requiring vacatur.

FERC also concluded it could dismiss the significance of SDGE's evidence for reasons that themselves were arbitrary. FERC averred it could ignore the CPUC's recommendation because that statement "was made before the Commission established settlement procedures in the TO5 rate case proceeding, and almost a full year before the settlement was reached," and thus supposedly had "little value in determining the CPUC's intent during settlement negotiations." 1-ER-42-43 (Refund Rehearing Order at P25). But that statement articulated the CPUC's litigation position on the very issue that FERC set for hearing and that the Settlement

resolved, developed at length in a standalone section of the filing urging that the Adder issue "be determined in the pending [PG&E] litigation." 3-ER-461 (CPUC Protest at 33). That litigating position is eminently relevant in determining the parties' shared intent in the Settlement that they reached.

FERC dismissed DWR's statement—that the Adder issue "may get decided" in the CPUC Adder Litigation—as follows: "'*May* get decided' means that it may also not be decided." 1-ER-43 (Refund Rehearing Order at P25). This is nonresponsive. Even if the CPUC Adder Litigation was not certain to resolve that issue, SDG&E's point is that the Refund Provision aimed at the contingency where the then-pending proceedings *did* resolve the issue. And DWR's statement is one brick in a solid wall of evidence showing that California from the outset understood—and itself *requested*—that SDG&E's Adder would be resolved in the CPUC Adder Litigation, and that the Refund Provision was intended to incorporate that outcome. SDG&E's reading is entirely consistent with that extrinsic evidence. FERC, by contrast, has identified no evidence supporting its implausible interpretation.

### D. FERC's Unmoored Reading Produces Unreasonable And Inequitable Results.

Another principle supports the same conclusion: Contracting parties are "presumed to be rational persons pursuing rational ends" and hence courts will not read contracts to produce "results that [such] parties … are very unlikely to have

agreed to seek." *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002). That generally applicable principle again applies with special force under California law. A court "should avoid an interpretation which will make the contract unusual, extraordinary, harsh, unjust or inequitable, or which would result in an absurdity." *W. Pueblo Partners, LLC v. Stone Brewing Co., LLC*, 90 Cal. App. 5th 1179, 1185 (1st Dist. 2023) (citation omitted); *accord Nat'l Shooting Sports Found., Inc. v. California*, 5 Cal. 5th 428, 433 (2018); Cal. Civil Code § 1638. This principle does not require an outright "absurdity"—though FERC's interpretation is absurd. California instead directs that a contract "must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect," Cal. Civ. Code § 1643—presuming, again, that contracting parties are reasonable people intending reasonable outcomes.

Here, three aspects of FERC's interpretation are patently unreasonable and rewrite the Settlement Agreement into a deal no one would sign.

*First*, FERC unreasonably read the Refund Provision to create a limitless refund obligation that can be triggered at *any* time for *any* reason, as long as FERC some day concluded Petitioners were ineligible for the Adder. If California had enacted its new law decades later, FERC's interpretation would require refunds for the whole period. And it would make no difference *why* SDG&E became ineligible. If (for example) SDG&E voluntary left CAISO; if Congress repealed the federal rate

incentive altogether; or if CAISO ceased to exist—all of these scenarios under FERC's interpretation would require refunds back to June 1, 2019. It is hard to imagine why SDG&E would have agreed to such an open-ended obligation.

FERC's response is pure *ipse dixit*. It disagrees that "no rational party would have subjected itself to an open-ended settlement." 1-ER-44 (Refund Rehearing Order at P26). But say-so is not reasoned decisionmaking. And FERC supported its conclusion simply by declaring that SDG&E is a sophisticated party with experience in rate proceedings. *Id.* That observation, however, only renders more unreasonable FERC's failure to explain its conclusion: no sophisticated party would have intended FERC's irrational reading over SDG&E's alternative reading, which makes sense from the perspective of both SDG&E and California. And under bedrock contract principles, FERC cannot so easily disavow its duty to grapple with whether its interpretation yields unreasonable results.

*Second*, FERC unreasonably read the Refund Provision to require SDG&E to return the Adder for a period when this Court held SDG&E was indisputably entitled to it. *CPUC II*, 29 F.4th at 466-67. FERC's interpretation of the Refund Provision drains *CPUC II* of any practical effect. It would indeed be unusual, harsh, unjust, and inequitable to read the Refund Provision to require SDG&E to return funds collected via the Adder during a period when this Court held that California law did

*not* require RTO membership and SDG&E was entitled to the Adder—as evidenced by the fact that PG&E and SCE kept their Adder for that period.

*Third*, FERC unreasonably gave California a windfall beyond what its litigation position requested. *Supra* at 40-41. Only SDG&E's reading treats the provision as a rational compromise between the parties' positions: it allowed the parties to settle while maintaining their litigation positions in the CPUC Adder Litigation. FERC's reading—in which California received a springing right to refunds that California could never have obtained by litigating the rate case—makes no sense.

### E. FERC's Reading Gives Retroactive Effect To Later-Enacted Law, Contrary To The Presumptions Of Both California And Federal Law.

Finally, FERC's interpretation flies in the face of the presumption against retroactivity. SDG&E's position is that the Refund Provision gave California a chance to obtain refunds if it prevailed in then-ongoing litigation about Petitioners' Adder entitlement under then-applicable state law. FERC, by contrast, concluded that refunds could be (and were) triggered by a law that did not exist when the parties entered the Settlement Agreement. But California contract principles again say the opposite, specifying that a "contract must be so interpreted as to give effect to the mutual intention of the parties *as it existed at the time of contracting*," Cal. Civ. Code § 1636 (emphasis added), and that laws "enacted subsequent to the execution

of an agreement are *not* ordinarily deemed to become part of the agreement unless its language clearly indicates this to have been the intention of the parties," *Swenson v. File*, 3 Cal. 3d 389, 393 (1970) (emphasis added). And again, this is not an idiosyncratic California doctrine but "a generally accepted rule." *Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733, 738 (6th Cir. 2013) (citing 11 Richard A. Lord, *Williston on Contracts* § 30:23 (4th ed. 1990) for the same proposition). That rule serves the overriding goal of ascertaining the parties' intent: "Contracting parties are free to agree that their rights and duties will track the law as it changes, but because the terms of their bargain could be significantly altered, they must make their intent to do so clear." *Id.*

As noted, the Settlement Agreement nowhere contemplates new legislation. Instead, the parties agreed to it when they were briefing whether *then*-existing California law mandated Petitioners' RTO participation and the CPUC itself recommended tying SDG&E's Adder eligibility to then-ongoing proceedings applying that then-existing California law. Certainly no one in 2019 foresaw that the California Parties would lose their then-pending litigation on the meaning of then-existing California law; the California legislature would change the law years later; and FERC would interpret that new law to render SDG&E ineligible for the Adder and responsible for refunds for the entire period. Worse, FERC's reading unreasonably posits that SDG&E agreed to vest in its litigation opponent a *unilateral*

right to trigger retroactive refunds: The California Parties included various arms of the State of California, which exercises ultimate authority over state law. FERC again never explained why SDG&E would have agreed to put itself at California's mercy in this way.

FERC's contrary arguments lack merit. *First*, the anti-retroactivity presumption described above disposes of FERC's assertion that California's new law was foreseeable. 1-ER-44 (Refund Rehearing Order at P27). It was not foreseeable as a factual matter and, regardless, *Swenson*'s presumption treats future legislative changes as unforeseeable as a matter of law (absent a clear statement agreeing to give effect to future legislation). 3 Cal. 3d at 393. That principle reflects a sensible judgment given the uncertainties inherent in legislative change.

*Second*, FERC avers that "[t]he Adder Refund Provision was triggered by the Commission issuing an order finding that California IOUs are no longer entitled to the RTO Adder, not as a result of any change in California law." 1-ER-43 (*id.* at P26). This, however, is a distinction without a difference: California's legislation was the essential predicate for FERC's order, and FERC's order was thus "as a result of [a] change in California law." *Id.* FERC interpreted the Refund Provision to give effect to orders based on a law "enacted subsequent to the execution of an agreement"—thereby impermissibly making that post-execution law "part of the agreement." *Swenson*, 3 Cal. 3d at 393.

### F. FERC's Remaining Arguments Do Not Withstand Scrutiny.

FERC's remaining arguments fail.

*First*, FERC avers that SDG&E could have limited its liability by "us[ing] more specific language," as was used in PG&E's TO19 and TO17 settlements. 1-ER-44 (Refund Rehearing Order at P26 (quotation marks omitted)). But the same can be said in any case where meaning is disputed. And this argument betrays that FERC fundamentally misunderstood its contract-interpretation task. Contract interpretation is, as explained, about ascertaining intent, not holding one party to a manufactured clear-statement rule. Moreover, the TO19 and TO17 Settlement Offers, if anything, support SDG&E for the reasons explained above.

*Second*, FERC tries to escape the most absurd consequences of the unlimited future liability it imposed by positing that SDG&E could have reduced its exposure by notifying stakeholders of its intent to file a new rate, as it did in June 2024. 1-ER-104 (Refund Order at P42). If SDG&E had filed a new formula rate, it would no longer be bound by the Refund Provision. *Cf.* 2-ER-345 (TO5 Settlement Agreement §1.5.3). But an unreasonable reading does not become less so simply because a party might have had, in hindsight, some ability to mitigate the worst. Utilities will sometimes go many years between rate filings, and FERC's reading unreasonably posits that SDG&E gave up this option by agreeing to a Refund Provision that required it to file as soon as it could to avoid unlimited exposure.

Nor, anyway, would a quick filing have actually avoided the unreasonable and retroactive effects of FERC's reading. Even had SDG&E filed for new rates effective October 1, 2022 (that is, immediately after AB 209's September 2022 effective date), SDG&E would *still* be liable for refunds for the period between June 1, 2019 and September 30, 2022—a period when this Court conclusively held in *CPUC II* that SDG&E was entitled to the Adder. That unavoidable retroactive effect underscores the unreasonableness of FERC's approach.

## II. FERC UNLAWFULLY DENIED SDG&E THE ADDER IN THE TO6 PROCEEDING.

FERC's decision to deny SDG&E the Adder in the TO6 proceeding was also contrary to law and arbitrary and capricious. Petitioners have argued that FERC's approach violates the FPA, which requires that FERC "shall" provide incentives "to each" utility "that joins" an RTO and does not permit FERC to impose an atextual voluntariness requirement. 16 U.S.C. § 824s(c). Petitioners have also argued that the FPA preempts California's RTO mandate because the mandate impermissibly regulates transmission facilities over which FERC has exclusive jurisdiction, *id.* § 824(b)(1); renders RTO membership mandatory when Congress by statute directed that it must remain voluntary, *id.* § 824a(a); and impermissibly targets the federal rate, *see Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). While a panel rejected those arguments in an unpublished decision, *see PG&E*, 2025 WL 1912363, at *1-3, FERC's TO6 Rehearing Order is also unlawful and arbitrary and

capricious for another reason the panel did not address: it violates the FPA's prohibition on undue discrimination, rendering FERC's approach impermissible even if the statute did not foreclose FERC's voluntariness requirement.

The FPA charges FERC with ensuring that rates are just and reasonable, and bars "any undue preference or advantage to any person" or "any unreasonable difference in rates, charges, service, facilities, or in any other respect." 16 U.S.C. § 824d(a)-(b). FERC is likewise obligated under the FPA to correct rates or practices that are unduly discriminatory. In addition, '"[w]here an agency treats similar situations differently without reasoned explanation, its decision will be vacated as arbitrary and capricious."' *Port of Seattle*, 499 F.3d at 1034 (quoting *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 815-16 (D.C. Cir. 1998)). Thus, FERC may not apply "different standards to similarly situated entities and fail[] to support this disparate treatment with a reasoned explanation and substantial evidence." *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005); *see W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 21 (D.C. Cir. 2014) (requiring FERC to justify treating market participants differently); *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) (concluding "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently" (quotation marks and alterations omitted)).

Here, FERC has adopted a policy that unduly discriminates against Petitioners by deferring to distinctions drawn in a law California enacted to target Petitioners in the immediate aftermath of losing in *CPUC II*. Under FERC's policy—really, California's policy—other California transmission owners that are part of CAISO continue to receive the Adder. For example, Viridon, an independent transmission provider, continues to do so, as FERC has affirmed. *Viridon Cal. LLC*, 186 FERC ¶ 61,143 at PP56-57 (2024). But Petitioners, California's three large investor-owned utilities, do not receive the Adder even though they are also CAISO members, provide the same transmission benefits to customers as other transmission-owning CAISO members, and bear the same burdens of CAISO membership. Petitioners differ only in that California has *chosen* to go after their Adder. California litigated against Petitioners in *CPUC I* and *CPUC II*, and when this litigation failed, enacted legislation that expressly picked out Petitioners and transparently aimed to reverse the outcome of *CPUC II*.

It is unduly discriminatory for FERC to treat Petitioners differently and worse simply because California chose to target Petitioners' Adder. Even if the Adder statute did not of its own force *require* FERC to grant the Adder to the targeted utilities, FERC would still have *authority* to grant Petitioners the Adder. *E.g.*, 16 U.S.C. §§ 824d(a), 824e(a). More than that: The FPA *obligates* FERC to do so if necessary to avoid such discrimination. *E.g.*, *id.* § 824s(d).

FERC conceded that Petitioners are "otherwise similarly-situated" to other California entities and defended its discriminatory treatment solely on the ground that California targeted Petitioners via "the requirement … for SDG&E to participate in CAISO." 1-ER-28 (TO6 Rehearing Order at PP53, 54). But this is no answer. The Adder is part of the federal rate, and the FPA imposes *on FERC* the duty—and exclusive jurisdiction—to ensure federal rates are just and reasonable and not unduly discriminatory. 16 U.S.C. §§ 824d(a); 824e(a). FERC cannot abandon that duty by averring that a state (which is not responsible for federal transmission rates) has decided to treat Petitioners worse.

Indeed, "Federal agencies may not subdelegate their 'decision-making authority ... to outside entities—private or sovereign—absent affirmative evidence of authority to do so.'" *La. Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 696 (D.C. Cir. 2017) (citation omitted). And when FERC has previously faced charges that it had unlawfully discriminated by deferring to state-set classifications, it defended against those charges by averring that it would "continue to exercise oversight of the state" decision and would act if "presented sufficient evidence of unjust, unreasonable, unduly discriminatory, or preferential rates." *Id.* (quotation marks omitted). Here, by contrast, FERC relied entirely on a state-determined classification to reject Petitioners' claim of undue discrimination in the federal rate.

FERC's reasoning is circular: It deems Petitioners differently situated solely because of California's arbitrary state-law distinction at issue. At minimum, if FERC is going to shape its own rate policy to reflect distinctions drawn by state law, it must ensure that those distinctions are both rational and comport with the FPA. *E.g.*, *La. Pub. Serv.*, 860 F.3d at 696. FERC, however, did not even address whether California's distinctions comport with the FPA. Nor is it any answer to say that FERC is not the "correct forum" to raise this issue and Petitioners should take up any objection with California. 1-ER-28 (TO6 Rehearing Order P54). At issue here is *FERC's* obligations under federal law and *FERC*'s policy of incorporating California's arbitrary and discriminatory treatment of Petitioners into its own federal rate-setting. *La. Pub. Serv.*, 860 F.3d at 696.

The consequences of FERC's approach confirm its arbitrariness. By rubber stamping California's targeting of three named utilities, FERC has blessed a regime in which states—not FERC—decide who receives a federal rate incentive. States may now do so selectively, picking winners and losers among the utilities they regulate. Nor is this concern a mere hypothetical: After FERC's recent decisions relying on state RTO mandates to strip the Adder, these mandates are proliferating: Connecticut, Maryland, Rhode Island, and New Jersey enacted such statutes over the last year, and Pennsylvania is considering such legislation as well. *Supra* at 6-7 & n.2. Nothing stops these states or others from doing what California has done and

gerrymandering their mandates to favor some in-state utilities over others, based on their own parochial reasons. Under the decision below, FERC blindly ratifies such choices without asking whether they yield undue discrimination in the federal rate.[7]

The TO6 Rehearing Order cited two cases, neither supporting FERC. The Sixth Circuit's *Dayton* case concerned an Ohio statute requiring RTO participation for *all* utilities that "own or control transmission facilities" in the state. *Dayton Power & Light*, 176 FERC ¶ 61,025 at P5 (2021); *see Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1129 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 397 (2025). That non-binding, out-of-circuit decision did not bless the even more egregious discrimination here—differential treatment among utilities in the same state.

FERC fares no better with its citation to *SCE v. FERC*, 717 F.3d 177, 185-86 (D.C. Cir. 2013). 1-ER-28 (TO6 Rehearing Order at P54 & n.160). If that case has any relevance, it supports Petitioners. The D.C. Circuit rejected an undue discrimination challenge because FERC "explained how *its* different purposes determine *its* different approaches when setting the ROE for a single electric utility

---

[7] Because Petitioners did not raise this issue to this Court in *PG&E* and the Court did not resolve it, there is no issue preclusion bar to raising this argument at this time. Nor is there any potential bar relative to FERC's own administrative decision in the PG&E Adder Orders. Even FERC did not assert in the TO6 proceeding that Petitioners' undue discrimination argument is an impermissible attack on a prior FERC order, and any such argument would be meritless in any event given FERC's new application of the PG&E Orders to strip SDG&E of its Adder for the first time. *See Sacramento Mun. Util. Dist. v. FERC*, 428 F.3d 294, 299 (D.C. Cir. 2005); *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546-47 (D.C. Cir. 1958).

as opposed to a group of utilities with diverse risk profiles." 717 F.3d at 186. That is, FERC explained the very thing it failed to explain here, where it outsourced to California its own duty to avoid undue discrimination.

## CONCLUSION

The Court should grant the petitions and vacate the orders under review.

July 9, 2026

Respectfully Submitted,

*Zachary C. Schauf*

Zachary C. Schauf
Anand Viswanathan
Arjun R. Ramamurti
JENNER & BLOCK LLP
1099 New York Ave., NW Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
zschauf@jenner.com

Laurie Edelstein
JENNER & BLOCK LLP
525 Market Street, 29th Floor
San Francisco, CA 94105
Telephone: (628) 267-6800
ledelstein@jenner.com

*Counsel for Petitioners San Diego Gas & Electric Company, Pacific Gas and Electric Company, and Southern California Edison Company*

Ross Fulton
Dan King
SAN DIEGO GAS & ELECTRIC COMPANY
8330 Century Park Court
San Diego, CA 92123
Telephone: (858) 654-1861
rfulton@sdge.com

John Perkins
Tara Kaushik
PACIFIC GAS AND ELECTRIC COMPANY
300 Lakeside Drive
Oakland, CA 94612
Telephone: (650) 766-9147
jr4t@pge.com

Andrea Tozer
Alexa Mullarky
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Avenue
Rosemead, CA 91770
Telephone: (626) 302-6713
Andrea.tozer@sce.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s) 25-1980, 25-5064**

I am the attorney or self-represented party.

**This brief contains 13,831 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *_/s/ Zachary C. Schauf_* **Date** July 9, 2026

## CERTIFICATE OF SERVICE

I certify that on July 9, 2026, I electronically filed the foregoing Brief and Excerpts of Record with the clerk of the court for the United States Court of Appeals for the Ninth Circuit, using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: July 9, 2026

/s/ *Zachary C. Schauf*

Zachary C. Schauf
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000
zschauf@jenner.com